UNITED STATES of America

v.

SUN–DIAMOND GROWERS OF
CALIFORNIA, Defendant.

Crim. Action No. 96–193 RMU.

United States District Court,
District of Columbia.

Sept. 9, 1996.

Donald C. Smaltz, Theodore S. Greenberg, Kathleen M. Nicolaides, Barry Coburn, Office of Independent Counsel, Alexandria, VA, for Plaintiff.

Richard A. Hibey, Eric W. Bloom, Winston & Strawn, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER

URBINA, District Judge.

### Denying Sun–Diamond's Motion to Dismiss the Indictment

#### I. Background

On September 9, 1994, pursuant to 28 U.S.C. Section 593(b), the United States Court of Appeals for the District of Columbia Circuit, Special Division for the Appointment of Independent Counsels (Special Division), appointed Donald C. Smaltz Independent Counsel to investigate whether former Secretary of Agriculture Alphonse Michael (Mike) Espy (Secretary Espy) violated federal criminal law by accepting improper gifts from organizations or individuals with business matters pending before the Department of Agriculture while he was Secretary of Agriculture.

Sun–Diamond, a large agricultural cooperative based in California, had business matters pending before the Department of Agriculture during Secretary Espy's tenure. Sun–Diamond is owned by five member cooperatives: Diamond Walnut Growers, Sun-Maid Growers of California, Sunsweet Growers, Inc., Valley Fig Growers, and Hazelnut Growers of Oregon. In December 1994, the Office of Independent Counsel (OIC) began its investigation of Sun–Diamond using a grand jury convened by this court. The grand jury returned an indictment against Sun–Diamond alleging that the defendant had unlawfully provided $9,000 worth of gifts, directly or indirectly, to Secretary Espy, in violation of the federal gratuity statute, 18 U.S.C. § 201(c)(1)(A). The indictment further alleges that Sun–Diamond devised and executed a scheme to make an unlawful corporate contribution, in the name of another, in the amount of $4,000 to a federal candidate for office, in violation of 2 U.S.C. § 441b(a) and 441f.

Specifically, count I alleges that Sun–Diamond, through its former Senior Vice President, Richard Douglas (Mr. Douglas), expended on Secretary Espy's behalf, over a 14 month period, approximately $2,295 for tickets to the 1993 U.S. Open Tennis Tournament, approximately $2,427 for luggage, approximately $665 for meals, and approximately $524 for a framed print, packing for the print, and a crystal bowl. Count I also charges that all of the expenses associated with the gratuities given by Mr. Douglas to Secretary Espy were reimbursed by Sun–Diamond as company business expenses. Count II alleges that Mr. Douglas advanced $3,100 to Secretary Espy's girlfriend, Patricia Dempsey, to pay for the cost of an airplane ticket so that she could accompany Secretary Espy to a trade association conference in Greece. The indictment further alleges that the trade association that sponsored the conference reimbursed Mr. Douglas.

Counts III through IX allege the following: Mr. Douglas and James H. Lake (Mr. Lake), a principal of Robinson, Lake, Sawyer and Miller (Robinson–Lake), a public relations firm in Washington, D.C., together devised a scheme to enable Sun–Diamond to make an unlawful corporate contribution in the name of another.[1] To effect this contribution, Mr. Douglas and Mr. Lake allegedly agreed that Mr. Lake would obtain $1,000 contribution checks from several Robinson–Lake employees. Robinson–Lake then invoiced Sun–Diamond for a false and fictitious expense sufficient to cover these contributions. Finally, Sun–Diamond's payment of the expense to Robinson–Lake was used to reimburse the individuals that advanced the campaign contributions.[2]

## II. Discussion

This matter comes before the court upon Sun–Diamond's motion to dismiss the indictment in this case. Sun–Diamond raises six arguments in support of its motion. Each argument addresses one or more counts contained in the indictment. First, Sun–Diamond argues that count I, which charges a violation of the gratuity statute, should be dismissed because it fails to allege that Sun–Diamond provided things of value to Secretary Espy to reward him for an act he had already performed or had committed himself to perform. Second, Sun–Diamond posits that count II, which also alleges a violation of the gratuity statute, should be dismissed because it fails to allege that Sun–Diamond provided a "thing of value" to Secretary Espy. Third, Sun–Diamond moves to dismiss counts I and II because the allegations set forth therein do not distinguish between innocent gift giving and illegal gratuities. Fourth, Sun–Diamond requests that the court dismiss counts III through IX of the indictment because the violations alleged in those counts are outside the scope of the independent counsel's jurisdiction. Fifth, Sun–Diamond moves to dismiss count III, which alleges wire fraud, because the alleged wire communication at issue did not further

---

1. Henry Espy, Secretary Espy's brother, was to be the beneficiary of the contribution. Henry Espy ran, unsuccessfully, for the congressional seat vacated by Secretary Espy when he became Secretary of Agriculture.

2. Counts III and IV allege wire fraud. Counts V through IX allege violations of the Federal Election Campaign Act.

the execution of the alleged scheme.[3] Lastly, Sun–Diamond moves to dismiss, or in the alternative strike, the part of counts III and IV that allege that Mr. Douglas and Mr. Lake sought to defraud two entities, Robinson–Lake and its parent company, Bozell Worldwide, Inc., of the intangible right to Mr. Lake's honest services. The court will address each argument *seriatim*.

## A. Gratuity Statute

### 1. Introduction

Sun–Diamond moves to dismiss count I of the indictment on the basis that the indictment fails to allege that Sun–Diamond provided things of value to Secretary Espy for an improper purpose. More particularly, Sun–Diamond claims that the indictment does not allege that Sun–Diamond provided things of value to reward Secretary Espy for a specific act he had already performed or was already committed to perform. Sun–Diamond contends that the indictment must allege and the OIC must demonstrate a nexus between the alleged gratuity and "a definite official act for which [Sun–Diamond] intend[ed] to compensate[,]" Secretary Espy in order for its conduct to be in violation of 18 U.S.C. § 201(c), the gratuity statute. Given this required nexus, Sun–Diamond argues, the indictment must allege that it "intended to reward [Secretary Espy] for past action or action [the Secretary] was already committed to take." As fully discussed *infra*, to sustain a charge under the gratuity statute, it is *not* necessary for the indictment to allege a direct nexus between the value conferred to Secretary Espy by Sun–Diamond and an official act performed or to be performed by Secretary Espy. It is sufficient for the indictment to allege that Sun–Diamond provided things of value to Secretary Espy because of his position. Accordingly, the court denies Sun–Diamond's motion to dismiss count I.

### 2. Analysis

The indictment alleges that there were two matters pending before the Department of Agriculture and Secretary Espy, in which Sun–Diamond had a significant economic stake. They were the market promotion program (MPP) and the issue of whether the fumigant methyl bromide would be banned by the Environment Protection Agency (EPA). During 1993 and 1994, the Department of Agriculture administered a grant program, MPP, designed to increase export sales of certain U.S. agricultural commodities abroad. Under the MPP, the Secretary of Agriculture was authorized to award government funds to trade organizations, if the Secretary determined that such organizations would significantly contribute to the sale of U.S. farm commodities abroad. To receive money to market their products abroad, trade organizations submitted marketing plan applications to the Department of Agriculture. By law, the Secretary of Agriculture had to approve the award of MPP money to each trade organization. The trade organizations would in turn award money to companies, like the member cooperatives of Sun–Diamond, to pay for part of their marketing campaigns in foreign countries.

Beginning in or about August 1993, the Department of Agriculture was required by law to develop regulations which gave small-sized entities preference in obtaining certain MPP funds. During that time, the Department of Agriculture entertained the issue of whether to include cooperatives in the definition of a small-sized entity. The indictment alleges that Sun–Diamond wanted the Secretary of Agriculture to direct the Department of Agriculture to promulgate MPP regulations that would allow Sun–Diamond member cooperatives to receive the preferences provided for small entities. In addition, Sun–Diamond wanted the Department of Agriculture to continue to study the issue with a view towards giving cooperatives the same preference given to small-sized entities.

The other matter pending before the Department of Agriculture in which Sun–Diamond had an economic stake involved methyl bromide. Methyl bromide was a chemical used to kill pests and other insects when planting orchards and fields, as well as after a commodity was harvested. Certain Sun–Diamond member cooperatives used the

---

3. The alleged scheme relates to the effort by Mr. Douglas and Mr. Lake to make an unlawful campaign contribution to help retire Henry Espy's campaign debt.

chemical for post-harvest fumigation of walnuts, prunes, and figs.

In 1992, the EPA announced plans to promulgate a rule which would phase out and ultimately bar the use of the chemical in the U.S. In 1993 and 1994, Sun–Diamond, and more particularly Diamond Walnut Growers, Inc., was concerned that the loss of methyl bromide and a lack of a viable alternative thereto, would hurt their ability to sell their products. Consequently, Sun–Diamond sought the assistance of the Department of Agriculture to persuade the EPA to delay promulgating the rule that would phase out and eliminate the use of methyl bromide. Sun–Diamond also sought to have the Department of Agriculture increase its funding for research for alternatives to methyl bromide in the event that the use of the chemical became restricted or prohibited.

Count I alleges that Sun–Diamond violated Section 201(c)(1)(A) by providing Secretary Espy with improper gratuities. Section 201(c)(1)(A), provides, in pertinent part,

> Whoever ... gives, offers, or promises anything of value to any public official, former public official, or person selected to be a public official, for or because of any official act performed or to be performed by such public official, former public official, or person selected to be a public official ... shall be fined under this title or imprisoned not more than two years, or both.[4]

Sun–Diamond concedes that Secretary Espy was a public official during the relevant time period of the indictment, namely, January 5, 1993 through March 11, 1994. Additionally, Sun–Diamond acknowledges that count I sufficiently identifies things "of value" that Sun–Diamond allegedly gave to Secretary Espy,

e.g., tickets, meals and limousines for the U.S. Open Tennis Tournament, luggage, and meals at restaurants. Sun–Diamond, however, maintains that it did not give these items of value to Secretary Espy "for or because of any official act performed or to be performed by" Secretary Espy.[5] The pertinent official acts relate to the MPP and methyl bromide, the two matters pending before the Department of Agriculture in which Sun–Diamond had a significant economic stake.

■■■ The issue before the court is whether, with respect to appointed officials, the gratuity statute requires the indictment to allege a nexus between the provision of things of value and a specific official act performed or committed to be performed by the appointed official. This District Court and the various federal courts of appeal that have addressed this precise issue have concluded that the gratuity statute does not require such nexus to be alleged by an indictment. Rather, it is sufficient for the indictment to allege that the provider of the gratuity has matters within the purview of the official receiving the gratuity, and that the gratuity be provided "simply *because* of ... [the] official['s] position, in appreciation of th[e] relationship, or in anticipation of its continuation." *United States v. Secord*, 726 F.Supp. 845, 847 (D.D.C.1989) (emphasis in the original). "The Government need not prove that the gratuity was given in exchange for any specific official act; there need be no '*quid pro quo* ...'" *Id.* "[T]he Government must [only] show that Defendant acted simply because of [the individual's] official position ..." *Id.*[6]

Sun–Diamond's reliance on *United States v. Brewster*, 506 F.2d 62 (D.C.Cir.1974), is unavailing. In *Brewster*, a former United

---

4. Count I also alleges that Sun–Diamond violated 18 U.S.C. § 2, the aiding and abetting statute, which provides,

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2(a) and (b).

5. An official act is defined by 18 U.S.C. § 201(a)(3) (West Supp.1996) as being,

> any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

6. *See also United States v. Crutchfield*, 547 F.2d 496 (9th Cir.1977); *United States v. Alessio*, 528 F.2d 1079 (9th Cir.1976), *cert. denied*, 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976).

States Senator was charged with bribery and with accepting illegal gratuities. He was acquitted of the bribery charges. He was, however, convicted of accepting illegal gratuities in the form of campaign contributions that he received from a mail-order company that had an interest in defeating enactment of pending legislation to increase postal rates. *Id.* at 67. The Senator appealed his convictions and the U.S. Court of Appeals for the District of Columbia Circuit reversed on the basis that the jury instructions did not distinguish "with indisputable clarity" between the elements of bribery and gratuity. *Id.*

The *Brewster* court, in distinguishing between the elements constituting the crimes of accepting a bribe and accepting an illegal gratuity, explicitly stated: "The bribery section makes necessary an explicit quid pro quo which *need not exist if only an illegal gratuity is involved;* the briber is the mover or producer of the official act, *but the official act for which the gratuity is given might have been done without the gratuity* [.]" *Id.* at 72 (emphasis added). This statement weakens Sun–Diamond's argument that this Circuit requires the indictment to allege that a nexus between the gratuity and a specific official act exists. Under the bribery statute, the focus is on the briber who instigates an official act. However, as *Brewster* makes clear, under the gratuity statute, the emphasis is not on the act, which the official might have done with or without the provision of an improper gratuity. Rather, the definition of "official act" denotes that the official need not have undertaken or committed himself to undertake a specific act. An official act is one which involves "any decision or action on any question, matter, cause, suit, proceeding, or controversy, which may at the time be *pending* [.]" 18 U.S.C. § 201(a)(3) (emphasis supplied). Presently, the indictment alleges that there were two matters pending before Secretary Espy in which Sun–Diamond had a significant interest. There is no indication that the gratuity statute or the definition of the term "official act" require the indictment

to allege that Sun–Diamond intended to *reward* Secretary Espy for an act that he had done or committed himself to do.

In *Brewster,* the court's concern centered on an elected official's potential criminal liability under the gratuity statute. In the context of a politician receiving an illegal gratuity the court stated,

[n]o politician who knows the identity and business of his campaign contributors is ever completely devoid of knowledge as to the inspiration behind the donation. There must be more specific knowledge of a definite official act for which the contributor intends to compensate before an official's action crosses the line between guilt and innocence.

*Id.* at 81. The difficult question in *Brewster* therefore involved the ability of the jury to distinguish between illegal gratuities and legal campaign contributions. The court found that the trial judge had not made the distinction intelligible to the jury and, as a consequence, implicitly required a heightened nexus standard between the illegal gratuity and the official act. The court required such a standard because of the Senator's status as an elected, rather than an appointed official. As the court recognized, "[e]very campaign contribution is given to an elected public official probably because the giver supports the acts done or to be done by the elected official." *Id.* at 72 n. 26. In the case of elected officials, a nexus was required, otherwise, "... there is no distinction in the case of an elected public official between an illegal gratuity and a perfectly legitimate, honest campaign contribution." *Id.*

This concern is, however, inapplicable with respect to appointed officials. As the court subsequently explained, "the requisite [criminal] intent must be more clearly shown when the case involves a campaign contribution to 'an elected public official' than 'when the recipient is an ... appointed official.'" *United States v. Campbell,* 684 F.2d 141, 150 n. 16 (D.C.Cir.1982) (quoting *Brewster,* 506 F.2d at 73 n. 26).[7] Consequently, in cases

7. In *Campbell,* the court upheld the conviction of a Superior Court judge for receiving an illegal gratuity. The court concluded that it was "more than sufficient" for the trial judge to require that

the gratuity be given and received "knowingly and willingly," and "for or because of an official act." *Id.* at 150. The court did not require the

involving appointed officials, such as the present matter, it is sufficient for the indictment to allege that Secretary Espy received things of value because of his status as Secretary of the Department of Agriculture.[8]

Courts of appeal from other jurisdictions have similarly given Section 201(c) a broad interpretation. The Sixth Circuit has held that the "purpose of the [gratuity statute] is to reach all situations in which a government agent's judgment concerning his official duties may be clouded by the receipt of an item of value given to him by reason of his position." *United States v. Gorman*, 807 F.2d 1299, 1304 (6th Cir.1986), *cert. denied*, 484 U.S. 815, 108 S.Ct. 68, 98 L.Ed.2d 32 (1987). In *United States v. Evans*, 572 F.2d 455 (5th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978), the Fifth Circuit stated:

> [U]nder the unlawful gratuity subsection all that need be proven is that the official accepted, because of his position, a thing of value 'otherwise than as provided by law for the proper discharge of official duty.'... Thus, [the gratuity statute] makes it criminal for a public official to accept a thing of value to which he is not lawfully entitled, regardless of the intent of the donor or donee.

*Id.* at 480–481 (internal citations omitted). Importantly, our court of appeals has quoted with approval *Evans*, upon which the court in *Secord* relied. "'The gravamen of [the offense of taking an illegal gratuity] is not an

intent to be corrupted or influenced, but simply the acceptance of an unauthorized compensation.'" *United States v. Baird*, 29 F.3d 647, 652 (D.C.Cir.1994) (quoting *Evans*, 572 F.2d at 481). The court also cited with approval *United States v. Standefer*, 610 F.2d 1076, 1079 (3d. Cir.) (en banc), *aff'd on other grounds*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980), which concluded that all that the jury needs to find under the gratuity statute is that the defendant received a gratuity because of his official position.

Finally, in *United States v. Bustamante*, 45 F.3d 933 (5th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 473, 133 L.Ed.2d 402 (1995), the court held,

> To find a public official guilty of accepting an illegal gratuity ... no proof of a quid pro quo is required; it is sufficient for the government to show that the defendant was given the gratuity simply because he held public office ... In addition, the jury need not find that the official accepted the gratuity with the intent to be influenced. The jury must only conclude that the evidence establishes beyond a reasonable doubt that the official accepted unauthorized compensation.

*Id.* at 940 (internal citations omitted).[9] Thus, the government need not prove that the gratuity was given in exchange for a specific official act. *Bustamante*, 45 F.3d at 941. Consequently, the indictment need not allege that Secretary Espy took or committed to take any action beneficial to Sun–Diamond

government to establish a nexus between the gratuity and a specific official act.

**8.** Because the court finds the statute to be unambiguous, it declines Sun–Diamond's invitation to apply the rule of lenity. The rule of lenity stands for the principle that if a criminal statute is subject to multiple meanings, the court should resolve any ambiguity in favor of the defendant. *Bell v. United States*, 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955). That rule, however, is applicable only in situations where the language of the statute is not clear. *See United States v. Schwartz*, 785 F.2d 673, 681 (9th Cir.), *cert. denied*, 479 U.S. 890, 107 S.Ct. 290, 93 L.Ed.2d 264 (1986).

**9.** *See United States v. Niederberger* 580 F.2d 63 (3d Cir.1978), *cert. denied*, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978). In *Niederberger*, the court upheld the gratuity conviction of an IRS

employee in charge of auditing a large company which provided him with golfing trips. The court made clear that the gratuity statute did not obligate the government to prove a specific intent or to establish a *quid pro quo*. *Id.* at 69. *See also United States v. Alessio*, 528 F.2d 1079, 1082 (9th Cir.), *cert. denied*, 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976) (the court upheld gratuity conviction of defendant who paid part of a federal prison camp administrator's expenses during vacation because the administrator was in a position from which he could affect the conditions of confinement of the defendant's father, an inmate at the prison); *United States v. Umans*, 368 F.2d 725, 730 (2nd Cir.1966), *cert. denied*, 389 U.S. 80, 88 S.Ct. 253, 19 L.Ed.2d 255 (1967) (the court upheld gratuity conviction of CPA because of payments to IRS agents who disallowed a lesser portion of deductions than otherwise would have been disallowed).

with respect to the MPP and/or methyl bromide because, "[e]ven if corruption is not intended by the donor or the donee, there is still a tendency in such a situation to provide conscious or unconscious preferential treatment of the donor by the donee ..." *Evans,* 572 F.2d at 480.[10] The court therefore denies Sun–Diamond's motion to dismiss Count I of the indictment.

## B. Thing of Value

### I. Introduction

Sun–Diamond moves this court to dismiss count II of the indictment because it fails to allege that Sun–Diamond provided a "thing of value" to Secretary Espy. Rather, Sun–Diamond states that count II alleges that Sun–Diamond provided money to Secretary Espy's girlfriend. According to Sun–Diamond, the gratuity statute does not criminalize its conduct because the "thing of value" was not given directly to Secretary Espy. Sun–Diamond's construction of the term "thing of value," is, however, too narrow. A "thing of value" can constitute both tangible benefits, such as money, and intangible benefits, such as companionship. Because Secretary Espy received an intangible benefit from Sun–Diamond's gift to his girlfriend, Sun–Diamond's motion to dismiss count II on this basis shall be denied.

### 2. Analysis

■ Count II of the indictment alleges that Sun–Diamond Senior Vice President Richard Douglas arranged for Secretary Espy's girlfriend, Patricia Dempsey, to accompany them to Athens, Greece for a meeting of the International Nut Council (Council), whose members include Diamond Walnut, a member cooperative of Sun–Diamond. According to the indictment, the Council worked to expand the worldwide consumption of tree nuts. The indictment states that the Council thought it important to have Secretary Espy speak to its members at the IX World Tree Nut Congress held in Athens, Greece. The indictment alleges that Diamond Walnut wanted to use the Council to increase its exports. Count II alleges that Mr. Douglas, acting on behalf of Sun–Diamond, provided $3,100 in cash to Ms. Dempsey to cover the cost of her business class airplane ticket to Greece, and as such provided a benefit to Secretary Espy. The International Nut Council, the indictment alleges, reimbursed Mr. Douglas for these expenditures.

Secretary Espy received a benefit, albeit an intangible one, as a result of the actions allegedly taken by Mr. Douglas on behalf of Sun–Diamond. The term "thing of value" is a term of art which courts have interpreted broadly. It has been repeatedly used by Congress in many criminal statutes. *United States v. Girard,* 601 F.2d 69, 71 (2d Cir.), cert. denied, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979).[11] Since the term is not defined in the gratuity statute, the court must assume that the ordinary meaning of the words express the legislative purpose behind them. *Russello v. United States,* 464 U.S. 16, 17, 104 S.Ct. 296, 297, 78 L.Ed.2d 17 (1983).

The purpose of the gratuity statute is to cover all instances in which a public official may be improperly influenced by the receipt of an object of value because of his or her status. *Evans,* 572 F.2d at 480. Pursuant to the statute, Congress sought to punish the misuse of public office. *United States v. Williams,* 705 F.2d 603, 623 (2d Cir.), cert. denied, 464 U.S. 1007, 104 S.Ct. 524, 525, 78 L.Ed.2d 708 (1983). To fully implement Congress' policy judgment, the term "thing of value" must be broadly construed. *Gorman,* 807 F.2d at 1305. In analyzing whether an official received a thing of value, the focus should be on the value the official "subjectively attaches to the items received." *Id.* at 1305 (citing *Williams,* 705 F.2d at 623).

Courts have found the term to encompasses tangible, as well as intangible benefits.

---

10. As the *Brewster* court recognized, the gratuity statute covers a wide range of conduct because it is directed at the behavior of public officials "who should exercise extraordinary caution to avoid acts potentially violative of their public trust[.]" *Id.* at 77–78.

11. The court has found nothing in the legislative history of the gratuity statute that suggests Congress intended the term thing of value to be construed more narrowly than in other criminal statutes that employ the term.

*Id.* For instance, under the gambling statute, amusement has been judicially interpreted to constitute a thing of value. *Girard,* 601 F.2d at 71 (citing *Giomi v. Chase,* 47 N.M. 22, 132 P.2d 715, 716–17 (1942)); *Hightower v. State,* 156 S.W.2d 327, 328 (Tex.Civ.App. 1942). Courts have also found the testimony of an important government witness to be a "thing of value." *United States v. Zouras,* 497 F.2d 1115, 1121 (7th Cir.1974). Information can also be a thing of value. "For instance, state secrets might trade hands without cash consideration. Information obtained for political advantage might have value apart from its worth in dollars. In each case the information sought would have value to others, *in addition to the seeker." United States v. Sheker,* 618 F.2d 607, 609 (9th Cir. 1980) (emphasis supplied). In *Sheker,* the defendant was convicted of impersonating a federal officer in order to obtain a thing of value: The whereabouts of a witness against the defendant. *Id.* at 608–609. The court, in interpreting the term "thing of value" noted that the witness would also see a thing of value implicated—maintaining his whereabouts unknown to the defendant. *Id.* at 609. In addition, "[t]he criminal justice system, concerned with the safety of witnesses, has a similar interest." *Id.* Contrary to Sun–Diamond's implication, a thing of value does not necessarily require a direct benefit to the recipient but also includes a potential benefit to third parties.

In sum, an expansive construction of the term is necessary because "monetary worth is not the sole measure of value." *United States v. Nilsen,* 967 F.2d 539, 543 (11th Cir.1992), *cert. denied,* 507 U.S. 1034, 113 S.Ct. 1856, 123 L.Ed.2d 478 (1993) (citing *United States v. Schwartz,* 785 F.2d 673, 679 (9th Cir.1986)).[12] The fact that the alleged gratuity benefited someone other than the public official is not dispositive. As a result,

count II sufficiently alleges that Sun–Diamond improperly provided a thing of value to Secretary Espy. Specifically, the indictment alleges that Sun–Diamond thing provided money to Ms. Dempsey so that she could accompany Secretary Espy on his trip to Greece. In addition, the OIC contends that at trial it will establish, *inter alia,* that a portion of the $3,100 was used by Secretary Espy to pay his credit card bill which included the charge for Ms. Dempsey's airline ticket. This alleged benefit, coupled with any other intangible benefit that Secretary Espy may have received, including Ms. Dempsey's companionship, warrants the submission of this matter for the jury to determine whether in fact Secretary Espy received a benefit. *See United States v. McDade,* 827 F.Supp. 1153, 1175 (E.D.Pa.1993), *aff'd,* 28 F.3d 283 (3d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 1312, 131 L.Ed.2d 194 (1995) (holding that the question of whether a member of Congress benefited personally from scholarship payments to his son is one which should be resolved by the jury; not the court in a pretrial motion). Accordingly, count II properly alleges that Sun–Diamond provided something of value to Secretary Espy.[13]

■ Sun–Diamond also contends that the conduct alleged in count II and engaged in by Mr. Douglas cannot be imputed to Sun–Diamond because Mr. Douglas provided payment to Ms. Dempsey and the International Nut Congress reimbursed Mr. Douglas. Sun–Diamond therefore argues that it is not implicated in the allegations set forth in count II. The indictment, however, need not be so explicit. There is no need for the government to set out in full, its "theory of proof" in the indictment. *United States v. Edmond,* 924 F.2d 261, 269 (D.C.Cir.1991). The indictment must only state "the essential facts constituting the offense, not how the government plans to go about proving them."

12. In *Nilsen,* the court concluded that the term "thing of value" included intangible objectives, such as a defendant's attempt to extort a witness' testimony linking him to two pending state bank robbery charges. *Id.* at 543.
The Second Circuit, in a broad construction of the term thing of value, interpreted it to include commercially worthless stock which a defendant "believed" had value for himself. *United States v. Williams,* 705 F.2d 603, 623 (2d Cir.), *cert.*

*denied,* 464 U.S. 1007, 104 S.Ct. 524, 525, 78 L.Ed.2d 708 (1983).

13. Sun–Diamond also argues that count II must be dismissed because it fails to allege that a nexus between the purported gratuity and a specific official act existed. As the court, however, discussed in part II.A.2. *supra,* no such nexus need be alleged by the indictment.

*Id.* (citing Fed.R.Crim.P. 7(c)(1)). Rule 7(c)(1) states, in pertinent part, "the indictment ... shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." In this case, count II of the indictment sufficiently alleges that Mr. Douglas, an officer of Sun–Diamond, provided Ms. Dempsey $3,100 to defray the cost of her airline ticket to Greece. The fact that Mr. Douglas was reimbursed by the Council and not Sun–Diamond does not mean that Mr. Douglas' conduct cannot be imputed to Sun–Diamond, as Sun–Diamond maintains. Diamond Walnut, one of the owners of Sun–Diamond, and its President were members of the Council's Executive Committee. Mr. Douglas, a Sun–Diamond Vice President, undertook actions which arguably benefited Diamond Walnut, and as a result, Sun–Diamond.

### C. Vagueness

Sun–Diamond moves this court to dismiss counts I and II because the allegations set forth in those counts do not distinguish between innocent gift giving and legitimate business related conduct on the one hand, and illegal gratuities on the other. Sun–Diamond thus argues that the gratuity statute is void for vagueness as applied to Sun–Diamond's conduct.[14] Sun–Diamond contends that under the gratuity statute, the offender must give the thing of value in order to reward the official, in this case, Secretary Espy, for actions he had taken or was committed to take. Sun–Diamond avers that since the facts, as set forth in counts I and II, do not contain such allegations, the gratuity statute cannot be read by the court as reaching Sun–Diamond's conduct. Sun–Diamond argues that absent this intent to reward a public official, the gratuity statute, as applied to Sun–Diamond's conduct, would be transformed from a general intent criminal statute to a strict liability one by punishing the mere provision of things of value to public officials.

The question of whether Sun–Diamond's reason for providing the gratuities to Secretary Espy was an innocent one and not motivated because of his official position is one that should be entertained by the jury. The gratuity statute does not require the government to prove specific intent, nor does it require proof of a *quid pro quo. See Baird,* 29 F.3d at 652 (citing *Brewster,* 506 F.2d at 72–74 n. 26). As previously discussed by the court, the OIC is not required to show that Sun–Diamond intended to reward Secretary Espy for actions he had undertaken or had committed himself to undertake.

The gratuity statute requires that the gratuities be given to an appointed official "for or because of official acts" performed or to be performed by the appointed official. Consequently, to find Sun–Diamond guilty under the gratuity statute, the jury needs only to conclude that Sun–Diamond provided the gratuities to Secretary Espy because of his status as an appointed official; and not merely for innocent reasons, such as friendship.[15] In other words, the OIC must demonstrate that Sun–Diamond knew that it was providing the gifts to Secretary Espy not solely for the sake of friendship, or some other innocent reason, but instead, because of Secretary Espy's position.[16] The language of the statute and the cases that interpret it provided Sun–Diamond with sufficient notice of the prohibited conduct. As a result, the statute is not void for vagueness as it relates to Sun–Diamond's purported conduct. Accordingly, Sun–Diamond's motion to dismiss counts I and II based on this ground is denied.

---

14. Sun–Diamond does not maintain that the gratuity statute is, on its face, over broad. Such a challenge was rejected by the court in *Brewster,* 506 F.2d at 76–78.

15. In *Standefer,* the court, in determining whether the defendant had been properly convicted of receiving illegal gratuities, stated:

All that was required in order to convict [the defendant] was that the jury conclude that the gifts were given by him for or because of [the government official's] official position, and not solely for reasons of friendship or social purposes.

610 F.2d at 1080.

16. The statute does not, as Sun–Diamond contends, criminalize all things of value that are provided to appointed officials without regard as to the reason. The OIC must establish that Sun–Diamond provided improper gratuities to Secretary Espy *because* of his status as an appointed official.

### D. The Independent Counsel's Jurisdiction

#### 1. Introduction

Sun–Diamond moves this court to dismiss counts III through IX of the indictment on the basis that the violations alleged therein are outside the scope of the Independent Counsel's jurisdiction. Sun–Diamond maintains that the allegations in counts III through IX do not pertain to the subject matter of the Independent Counsel's investigation, namely, the alleged acceptance of improper gratuities by Secretary Espy. Sun–Diamond argues that because counts III through IX do not specifically relate to the subject of gratuities, the Independent Counsel exceeded his jurisdiction. Sun–Diamond contends that the Independent Counsel could only have referred the allegations set forth in counts III through IX to the Department of Justice for its consideration, or in the alternative, sought a referral from the Attorney General or Special Division over the allegations of wrongdoing contained in those counts. According to Sun–Diamond, since the OIC did not pursue either of these options, it exceeded its jurisdiction. The court, however, concludes that the Independent Counsel did not exceed its jurisdiction because the allegations set forth in counts III through IX are related to the core subject matter of the OIC's investigation and thus fall properly within the Independent Counsel's jurisdiction.[17]

#### 2. Analysis

■ Counts III through IX of the indictment allege that Sun–Diamond made illegal campaign contributions to the congressional election campaign of Secretary Espy's brother, Henry Espy. Specifically, the indictment alleges that as a result of Henry Espy's unsuccessful campaign for the Democratic Party nomination to the seat vacated by his brother when he became Agriculture Secretary, Henry Espy incurred campaign debts. To help retire these debts, the indictment alleges that Mr. Douglas, at the time a Senior Vice-president of Sun–Diamond and James H. Lake, a principal of the D.C. public relations firm of Robinson–Lake, together devised a scheme to enable Sun–Diamond to make unlawful corporate contributions in the name of another. To effectuate this contribution, the indictment alleges that Mr. Douglas and Mr. Lake agreed that Mr. Lake would obtain $1,000 contribution checks from several Robinson–Lake employees. Robinson–Lake then invoiced Sun–Diamond for a false and fictitious expense sufficient to cover the contributions. Sun–Diamond's payment of the false expense was purportedly used to reimburse the individuals making the campaign contributions.

The Ethics in Government Act, 28 U.S.C. § 591, et. seq., authorizes the Attorney General to investigate high-ranking federal executive officials, national campaign committee officials, or persons who present a personal, financial, or political conflict of interest to the Executive Branch. Id. at §§ 591(b) and (c). These persons are referred to as "covered persons," because they are explicitly covered by the Act. See United States v. Tucker, 78 F.3d 1313, 1322 (8th Cir.1996). Under the Act, the Attorney General, "upon completion of a preliminary investigation," may apply to the Special Division for the appointment of an independent counsel. 28 U.S.C. § 591(c)(1)(A). In the application, the Attorney General is to provide "sufficient information to assist the division of the court ... in defining [the] independent counsel's prosecutorial jurisdiction so that the independent counsel has adequate authority to fully investigate and prosecute the subject matter and all matters related to that subject matter." Id. at § 592(c).

The Special Division, in delineating the independent counsel's prosecutorial jurisdiction, must "assure that the independent counsel has adequate authority to fully investigate and prosecute the subject matter with respect to which the Attorney General has requested the appointment of counsel, and all matters related to that subject matter." Id. at § 593(b)(3). The independent counsel is also to have the jurisdiction to investigate and prosecute crimes that "may arise out of

---

17. The court notes that the jurisdiction of the Independent Counsel has inspired extensive treatment. Specifically, "the jurisdiction of the Independent Counsel ... has already been tested in district court by forty-three motions." In re Espy, 80 F.3d 501 (D.C.Cir.1996).

the investigation or prosecution of the matter with respect to which the Attorney General's request was made ..." *Id.*

On August 8, 1994, the Attorney General submitted an application to the Special Division for the appointment of an independent counsel, "to investigate whether any violations of federal criminal law were committed by Secretary of Agriculture" Espy. *In re Alphonso Michael (Mike) Espy,* Application for Appointment of an Independent Counsel, No. 94–2, at 1 (Aug. 8, 1994). The Attorney General's preliminary investigation developed evidence that Secretary Espy had received gifts from Tysons Foods, a major poultry processing corporation headquartered in Arkansas, with a number of pending regulatory issues before the Department of Agriculture. *Id.* at 2. In addition, the Attorney General concluded that Secretary Espy allegedly received gifts from other organizations and individuals with business matters pending before the Department of Agriculture. *Id.*

On September 9, 1994, the Special Division, pursuant to 28 U.S.C. § 593(b), appointed Donald C. Smaltz Independent Counsel to investigate

> to the maximum extent authorized by the Independent Counsel Reauthorization Act of 1994 whether [Secretary Espy] has committed a violation of any federal criminal law ... relating in any way to the acceptance of gifts by him from organizations or individuals with business pending before the Department of Agriculture.

*In re Alphonso Michael (Mike) Espy,* Div. 94–2, Order at 1–2 (D.C.Cir.Sp.Div. Sept. 9, 1994).

The Special Division further vested the Independent Counsel with authority to investigate

> other allegations or evidence of violations of any federal criminal law ... by any organization or individual developed during the Independent Counsel's investigation ... and connected with or arising out of that investigation.

*Id.* at 2. The Independent Counsel was also given the authority

> to seek indictments and prosecute any organization or individuals involved in any of the matters [outlined in the order], who are reasonably believed to have committed a violation of any federal law arising of such matters, including organizations or individuals who have engaged in an unlawful conspiracy or who have aided or abetted any federal offense.

*Id.* Finally, the Independent Counsel was to
> ... fully investigate and prosecute the subject matter with respect to which the Attorney General requested the appointment of independent counsel ... and all matters and individuals whose acts may be related to that subject matter ...

*Id.* at 3.

On September 14, 1994, after the appointment of the Independent Counsel, the Attorney General referred to him a related matter under 28 U.S.C. § 594(e). The referred matter was the allegation that "Secretary Espy hosted a fundraising dinner, attended by agricultural lobbyists, the purpose of which was to retire the campaign debt of his brother." *Notice of Prosecutorial Jurisdiction,* at 2.

The issue before the court is whether the allegations set forth in counts III through IX are related to the subject matter originally identified by the Attorney General in its application for the appointment of an independent counsel or in the subsequent referral. Preliminarily, the court notes that the OIC is not limited in its investigation to those persons that are explicitly covered by the Act. *Tucker,* 78 F.3d at 1322. The important issue is whether the persons or organizations and the matters being pursued by the OIC are related to the original subject matter of the OIC's investigation. "To demonstrate that one occurrence is 'related' to another, [the OIC] need only show that there is a reasonable causal or logical connection between the two, some tenable correlation between events." *Secord,* 725 F.Supp. at 566.

The court concludes that the Independent Counsel has not exceeded his jurisdictional mandate because the counts in question are related to the original subject matter of the investigation. In essence, counts III through IX charge that Sun–Diamond sought to gain improper influence with Secretary Espy by

providing money to help retire Henry Espy's campaign debt.[18] This factual predicate is intertwined with the original core subject matter of the Attorney General's investigation, as well as the subsequent related referral dealing with the allegations that Secretary Espy hosted a fundraising dinner to help retire his brother's campaign debt. The Attorney General's original investigation and request for appointment sought to determine whether certain individuals or organizations with business matters pending before the Agriculture Department improperly influenced Secretary Espy. "Obviously, the concern motivating such an investigation is that a cabinet Secretary may have been influenced improperly to favor or intervene in the gift-givers' causes pending before his or her Department." *In re Espy*, 80 F.3d 501, 508 (D.C.Cir.1996). Similarly, the allegations of counts III through IX present the alleged scenario that Secretary Espy was improperly influenced because of his status by individuals or organizations with matters before the Department of Agriculture. The court's conclusion is supported by *In re Espy* and *Unit-*

*ed States v. Tucker*, 78 F.3d 1313 (8th Cir. 1996).[19]

*In re Espy*, the independent counsel, Donald C. Smaltz, sought a referral of a related matter under section 594(e) of the Ethics in Government Act. He sought a referral over alleged "violations of federal criminal law by associates of Secretary Espy in matters related to the original grant of jurisdiction wherein the persons involved, patterns of conduct, witnesses, underlying facts, and applicable law overlap with" his original investigation. *Id.* at 503–504. The court granted the application for referral, noting that the independent counsel had

> identified evidence allegedly showing a pattern of conduct involving payment or gifts to Espy *and his close associates* in return for favorable treatment by the Department of Agriculture, which was developed during the [Independent Counsel's] original investigation of Secretary Espy's acceptance of gifts from parties with business pending before the Department of Agriculture[.] [20]

18. Indeed, Mr. Lake, who has entered a guilty plea before this court, admitted at the plea proceeding that Mr. Douglas advised him that Secretary Espy desired the help of Mr. Douglas in raising money to help retire Henry Espy's campaign debt. The Attorney General's September 14, 1994, referral also dealt with Secretary Espy's effort to retire his brother's campaign debt. The scheme that Mr. Lake and Mr. Douglas allegedly entered into is therefore closely related to the subject matter of the referral. Importantly, the referral does not include a reference to any gratuity. This fact undermines Sun–Diamond's argument that count III through IX do not mention the subject of gratuities, and as such, the allegations contained therein are beyond the OIC's jurisdiction.

19. Although these two cases involved the issue of referral, they are nevertheless directly applicable to this case. This is so because this court faces the same task the courts in those cases encountered. Namely, the court must interpret the independent counsel's original grant of prosecutorial jurisdiction. As the court in *In re Espy* stated:

> In referring a relating matter, this court is *interpreting*, but not expanding, the independent counsel's jurisdiction over a matter that was implicitly included in the original grant of prosecutorial jurisdiction, thus permitting the court to make explicit the independent coun-

sel's jurisdiction over a matter that was implicitly included in the original grant of prosecutorial jurisdiction.

*Id.* at 507 (emphasis added). This is precisely the same task this court has endeavored to meet.

20. The referral order in *In re Espy* demonstrates to this court the expansive reading of the Independent Counsel's jurisdiction given by the Special Division. The Special Division referred the following matter to the Independent Counsel pursuant to 28 U.S.C. § 594(c):

> The jurisdiction and authority to investigate and prosecute any violation of any federal law ... by any organization or individual, related to any application, appeal, or request for subsidy made to or considered by the United States Department of Agriculture, for which Secretary of Agriculture Alphonso Michael (Mike) Espy and/or his Chief of Staff Ronald Blackley intervened in the application, approval, or review process.

*In re Alphonso Michael (Mike) Espy*, Div. 94–2, Order at 1 (D.C.Cir.Sp.Div. April 1, 1996). The order does not contain a specific mention of any unlawful gratuity made directly to Secretary Espy. This fact also undermines Sun–Diamond's argument that because counts III through IX do not specifically allege that it gave Secretary Espy an improper gratuity, the OIC exceeded its jurisdiction.

*Id.* at 509.[21] Similarly, counts III through IX allege that Sun–Diamond engaged in a pattern of unlawful conduct that sought to benefit one of Secretary Espy's closest associates, his brother. In addition, the OIC has presented evidence that Secretary Espy was actively involved in soliciting contributions to retire his brother's campaign debt.[22]

In *United States v. Tucker,* the court also recognized the broad nature of an independent counsel's jurisdiction. In that case, the Independent Counsel was originally vested with jurisdiction to investigate the relationship of the President of the United States and the First Lady to a savings and loan association and a land development corporation. The issue before the court was to determine the propriety of a referral to the Independent Counsel. The referral sought to grant the Independent Counsel with jurisdiction to investigate another separate, corporation. As a result of the referral, the governor of Arkansas, his attorney, and the governor's business partner were indicted. The indictment was the subject of the appeal. The court concluded that the referral was appropriate because it was sufficiently related to the Independent Counsel's original jurisdiction. The court so concluded because there was an overlap in the defendants and in the witnesses between the original prosecutorial jurisdiction and the referral jurisdiction. *Id.* at 1321. In addition, there was a defined relationship between the defendants. *Id.*

The *Tucker* court's reasoning is particularly applicable to this case.[23] In this case, the connection between the allegations set forth in counts III through IX and the subject matter of the independent counsel's original grant of jurisdiction is at a minimum as strong as the connection found by the court in *Tucker.* Counts I and II, which Sun–Diamond concedes fall within the OIC's original jurisdiction, involve perhaps the most important individual in the case, Mr. Douglas, the same individual that counts III through IX implicate. Moreover, there is a clearly defined relationship between Mr. Douglas and Secretary Espy alleged by all counts. Consequently, the court concludes that counts III through IX fall within the purview of the OIC's jurisdiction. Sun–Diamond's motion to dismiss counts III through IX of the indictment is therefore denied.

### E. Wire Fraud

■■■ Sun–Diamond moves the court to dismiss count III of the indictment (wire fraud) because the alleged wire communication at issue did not further the execution of the alleged scheme that Mr. Douglas and Mr. Lake pursued. Count III alleges, in pertinent part, that:

> Defendant Sun–Diamond, acting through its Senior Corporate Officer [Richard Douglas], for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, knowingly and willfully transmitted and caused to be transmitted in interstate commerce, by means of a wire communication, that is: a telephone call between [Mr. Douglas] and James H. Lake's office ... in the District of Columbia, writings, signs, signals, pictures and sounds, that is among other things, a message that [Mr. Douglas] needed to speak with James H. Lake.[24]

---

21. The court rejected the Department of Justice's arguments against referral. The Department of Justice's position was similar to the one presently taken by Sun–Diamond. It contended that the matter for which the independent counsel sought referral was not sufficiently related to his original prosecutorial jurisdiction

> because the connection between the alleged wrongdoing by Secretary Espy's associates and the improper acceptance of gifts by Espy [was] too speculative ... The proper course in [the Department of Justice's] view [was] for IC Smaltz to allow [it] to investigate the new matters and determine whether to prosecute any federal offense it may discover.

*Id.* at 508. This is analogous to the argument presently proffered by Sun–Diamond.

22. Specifically, at Mr. Lake's guilty plea proceeding, the government's statement of facts (with which Mr. Lake agreed) stated that Mr. Douglas had told Mr. Lake that Secretary Espy wanted help in raising money to retire Henry Espy's campaign debt.

23. Importantly, our court of appeals, in *In re Espy,* adopted the *Tucker* court's approach in determining whether two matters were related. *In re Espy,* 80 F.3d at 507.

24. Count III refers to an illegal scheme allegedly devised by Mr. Douglas and Mr. Lake to enable Sun–Diamond to make unlawful corporate contribution to help retire Henry Espy's campaign debt.

The court must determine the sufficiency of a criminal indictment by examining the indictment on its face. *United States v. Critzer,* 951 F.2d 306, 307 (11th Cir.1992). "The indictment is sufficient if it charges in the language of the [applicable] statute." *Id.*[25] The indictment must, however, set forth the essential elements of the alleged crime. *United States v. Cole,* 755 F.2d 748, 759 (11th Cir.1985). Presently, wire fraud requires proof of a scheme to defraud and the use of an interstate wire communication to further this scheme. *United States v. Maxwell,* 920 F.2d 1028, 1035 (D.C.Cir.1990).

■ In count III of the indictment, the OIC has sufficiently identified the elements of the charged offense. The sufficiency of the evidence is a matter to be left for the trial. *See Critzer,* 951 F.2d at 307.[26] At trial, the OIC will have to establish that the use of the wire advanced or was integral to the execution of the fraud. *United States v. Vontsteen,* 872 F.2d 626, 629 (5th Cir.1989), *cert. denied,* 498 U.S. 1074, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991). The government will have to establish that the wire communication was at a minimum "incident[al] to an essential part of the scheme." *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954) (elements of mail fraud).[27] The indictment, however, only need inform the defendant of the charge against him/her and enable the defendant to plead double jeopardy in any subsequent prosecution for the same offense. *Critzer,* 951 F.2d

at 307. Count III of the indictment identifies the essential elements of the charged offense and provides Sun–Diamond with the requisite notice. Accordingly, Sun–Diamond's motion to dismiss count III is denied.

### ·F.   Intangible Right to Honest Services

Lastly, Sun–Diamond moves the court to dismiss, or in the alternative strike, the part of counts III and IV of the indictment that allege that Mr. Douglas and Mr. Lake sought to defraud both Robinson–Lake and Bozell Worldwide, Inc. of the intangible right to Mr. Lake's honest services.[28] Sun–Diamond maintains that count III and IV fail to allege that Mr. Douglas and Mr. Lake intended to cause Robinson–Lake and Bozell Worldwide, Inc. a concrete economic business injury.[29]

The wire fraud statute requires the indictment to allege that the defendant engaged in a "scheme or artifice to defraud ..." 18 U.S.C. § 1343. A "scheme or artifice to defraud" is a "scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Sun–Diamond argues that section 1343 requires that the alleged deprivation· threaten or cause harm to the victim's pecuniary interests. In support of this proposition, Sun–Diamond principally relies on *United States v. Lemire,* 720 F.2d 1327 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984). In *Lemire,* the court held that "an intentional failure to disclose a conflict of interest, with-

---

**25.** The wire fraud statute states, in pertinent part,

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1343 (West Supp.1996).

**26.** At trial, Sun–Diamond, can at the appropriate time, challenge the sufficiency of the evidence.

**27.** The requisite elements of "scheme to defraud" under the wire fraud statute and the mail fraud statute are the same. Therefore, cases interpreting mail fraud apply equally to wire

fraud. *United States v. Lemire,* 720 F.2d 1327, 1334–1335 n. 6 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984).

**28.** Robinson–Lake was a wholly-owned subsidiary of Bozell Worldwide, Inc. which in turn is owned by Bozell, Jacobs, Kenyon & Eckhardt, Inc., a Delaware corporation.

**29.** The indictment alleges that Mr. Douglas and Mr. Lake entered into a scheme to defraud Bozell Worldwide, Inc. of the intangible right of honest services of Mr. Lake by, among other things, creating. a false expense report seeking reimbursement from Bozell Worldwide of money expended by Mr. Lake for the benefit of Sun–Diamond; falsifying financial records; and causing Bozell Worldwide to advance funds for the purpose of concealing an illegal corporate campaign contribution by Sun–Diamond to help retire Henry Espy's campaign debt.

out more, is not sufficient evidence of the intent to defraud an employer necessary under the wire fraud statute." *Id.* at 1337. The court found that to deprive another of the intangible right of honest services, the defendant's conduct must carry "a significant risk of identifiable harm to the employer apart from the loss of his employee's loyalty and fidelity." *Id.*

*Lemire* was decided prior to the enactment of section 1346.[30] The court there noted that "Congress had not defined 'scheme or artifice to defraud' when it first coined that phrase." *Id.* at 1335. Congress, however, has since defined the term and the indictment tracks the statutory language with sufficient factual specificity. In addition, *Lemire* dealt with what the jury had to find in order to sustain a conviction under Section 1343; not with what an indictment must allege on its face.[31] The court was concerned that disloyalty alone would become an indictable crime. *Id.* at 1336. In the present case, however, the government has not indicated any intention to make such an argument.

The government has, however, indicated that it will prove at trial, consistent with *Lemire,* that both Robinson–Lake and Bozell, Inc. suffered identifiable harm. Specifically, counts III and IV allege a risk to the reputation of both entities and as a result, a risk to their continued business prosperity.[32] The OIC also intends to prove at trial that this risk was foreseeable to Mr. Douglas and Mr.

Lake.[33] Counts III and IV adequately allege violations of Sections 1343 and 1346. Consequently, Sun–Diamond's motion to dismiss, or in the alternative to strike portions of counts III and IV, is denied.

### III. Conclusion

For the foregoing reasons, it is this 7th day of September 1996,

**ORDERED** that Sun–Diamond's motion to dismiss be and is hereby **denied.**

**SO ORDERED.**

30. Section 1346 was enacted by Congress in November 1988 to overturn *McNally v. United States,* 483 U.S. 350 (1987). In *McNally,* the Court held that Section 1343 did not criminalize schemes to defraud citizens of their right to honest government. Section 1346 extended the applicability of "scheme or artifice to defraud" to include "a scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services." Congress, in enacting Section 1346 wanted "to reinstate all the pre-*McNally* case law pertaining to the mail and wire fraud statutes without change." Senate Judiciary Committee, Section Analysis of Anti–Drug Abuse Act of 1988, 134 Cong.Rec. S17, 360–02 (daily ed. Nov. 10, 1988); *see also United States v. Waymer,* 55 F.3d 564, 568 n. 3 (11th Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 1350, 134 L.Ed.2d 519 (1996) ("Congress' purpose in enacting § 1346 was to restore the mail fraud statute to its pre-*McNally* position ...").

31. Sun–Diamond has not presented the court with any authority that requires a count charging an offense under Section 1343 to include an allegation that the wrongdoer intend some economic harm.

32. "[A]lthough the scheme to defraud must threaten some cognizable harm to its target, that harm need not be a deprivation of tangible property or money; criminal fraud encompasses schemes to defraud persons of significant intangibles as well." *Lemire,* 720 F.2d at 1336 (citations omitted).

33. In *Lemire,* the court stated that "[s]o long as the jury finds [an intentional failure to disclose a conflict of interest] furthers a scheme to abuse the trust of an employer in a manner that makes an identifiable harm to him, apart from the breach itself, reasonably foreseeable, it may convict the employee of wire fraud." *Id.* at 1337.